Good morning, Your Honors. My name is Judith Seeds Miller, and I'm here to represent Rosa Maria Portillo-Escobar before this court this morning. Your Honors, if I may quote Judge Reinhart in his dissent in the Kodagolian case. He stated, he referred to lawful permanent residence as a basic and precious right to live and work in this country. And I would ask this court this morning to be very careful to hold the government to its burden to show by clear, unequivocal, and convincing evidence that Ms. Portillo abandoned that status. Well, but just a minute. Again, I'm going to be pretty quick, pretty clear with you. It doesn't seem to me that it is my job to determine whether the government has to meet its burden. That is the panel that's below me. My job is to suggest, is there substantial evidence to sustain their decision about that burden? Your Honor, I would submit on that point that no reasonable fact finder could find that the government met its burden. And I'd like to focus on the word unequivocal. Unequivocal means leaving no doubt. And the fact that that portion of the standard, clear, unequivocal, convincing, is so significant and so important is highlighted by the government's own brief, where at page 17, when it's citing this standard from Kodagolian, it deleted the word unequivocal from the quotation and substituted an ellipsis. But this deletion of a word from this standard, which I submit is somewhat deceptive, doesn't change what the standard is. Would you differentiate your case from Singh? Yes, Your Honor. I mean, I read Singh, and frankly, I think Singh has better facts than your case. Well, Your Honor, in Singh, the alien's wife and newborn child were living in England. He was from India, but had the equivalent of permanent residency both in England and in the United States. He spent very large portions of time in India. And by the way, I correct myself, Judge Reinhart's descent was in Singh, not in Kodagolian, that I quoted from. I was going to say, I think you quoted in his descent from Singh. Yes, I apologize. And I appreciate that Judge Reinhart talks very well about an LPR, and I don't have any trouble there looking at it. But in a descent, I usually don't take law from the descent. No, Your Honor. It was simply his characterization of the high value and the premium on this status, a status that's coveted. So what were the distinguishing facts between your case and Singh? Well, Your Honor, as I said, the wife and daughter both reside in England. You don't need to tell me the facts of Singh. You just need to tell me what distinguishes your particular facts from those facts in Singh. Because in my book, Singh has better facts for undoing the abandonment than yours. Well, Your Honor, in Singh, he had a sporadic work record. Ms. Portillo has worked every time she's been in the United States. She's been a very low-paid, yet a paid live-in nanny to her aunt's three children. She repeated over and over again in her testimony how seriously she takes that work. She also has worked in the fields. She has a lot more family ties in the United States than Singh. Singh had no family ties in the United States, at least that were reflected in the record. Ms. Portillo has her six siblings. She has no siblings in El Salvador. She has her father and her stepmother. Her mother was murdered when she was one year old back in El Salvador. Her aunt, uncle, and cousins all live in the United States. And in Singh, there were none of those relatives. As far as property, in Singh, he didn't have any property holdings. Ms. Portillo also doesn't. But when we take that in the context that her aunt was paying her $30 a day to watch three children, I calculated if she worked 365 days a year, she still wouldn't have made even $11,000. So I don't think we can hold that against her. And she also worked in the fields, which is a minimum wage position. The only relatives she has remaining in El Salvador are a grandfather and a grandmother. That was in 2005 when the testimony was taken. And those individuals were already in their late 70s and early 80s. I don't know if they're even still there. And she had one aunt. Her family owned property in El Salvador, but it was left to other relatives, and it wasn't hers. Her stays outside of the United States, Your Honor, were all meant to be of a limited duration. Counsel, didn't she spend 80 percent of her time during that period in El Salvador and 20 percent in the United States? She did, Your Honor. And the last time she was picked up, leaving El Salvador to come to the United States, she did it on a round-trip ticket? Your Honor, I'd like to discuss that ticket, because I think that actually is one of the most equivocal pieces of evidence on the record and not unequivocal. She was asked on cross-examination by the government, didn't you have a round-trip ticket with you? And she said yes. Well, wasn't it your intention to return to El Salvador in two months? And that's at page 165 of the record. And she said no. Now, knowing that they had the burden of proof, the next question should have been, well, young lady, why did you have a round-trip ticket in your possession? But that question wasn't asked. Good advocacy, a lawyer would just stop questioning at the point that they stopped. If you ask a witness why, you'll probably find out why. Of course, Your Honor, and we've seen that in many famous trials here in Los Angeles. But what we don't know is the reason that she had that ticket. Is it because it's less expensive to buy a round-trip ticket? Is it because her grandfather perhaps bought the ticket for her, and he was unaccepting of the fact that he was going to be losing his granddaughter to the United States? We don't know. That is not unequivocal evidence. That's evidence that creates doubt. When she went and tended her grandmother after her grandmother's heart attack, which the record reflects was her grandmother's fourth heart attack and her grandmother was going to have heart surgery, that was meant to be of a limited duration. I'll take care of my grandmother. Given those circumstances, it could have been a very short duration. Her grandmother, the record reflects, never really recovered, but she did come back to the United States nevertheless. The reason she returned to El Salvador was because her grandmother passed away and she wanted to take care of those things. Your Honor, I would submit that because this kind of analysis is so fact-intensive that the government has to, similar to the finding in the old case of Vosburgh v. Putney, the eggshell skull rule, the government has to take its lawful permanent resident as it finds it, and this particular lawful permanent resident is a very fragile young lady. I'm a tough cookie. I don't think I would have fallen into two year-long depressions when I went back to El Salvador and had to deal with those circumstances, but this individual did, and she didn't come back because she was getting treatment for her depression, which raises another unequivocal piece of evidence, and that is that the government attorney said, well, if you love your family so much and they're all in the United States, why didn't you come back to them when you were depressed? And she said, because the doctor told me I had to come to him for therapy every week. That's at page 175 of the record, Your Honor. She's a malleable young lady. She was in a very weakened psychological and emotional state, and she thought she had to go there. It was always her uninterrupted intention to come back and make this her permanent, continue to have this as her permanent home. I believe I've gone over. You haven't gone over. I haven't gone over, then I'll resume. I better save it. The yellow light means you're about out of time. May it please the Court, Carol Federighi for the respondent, Eric Holder, the Attorney General of the United States. The record does not compel reversal of the agency's determination that Ms. Portillo had abandoned her lawful permanent residence status. She spent, in the five-and-a-half years since she got her lawful permanent residence status, she spent 80% of her time outside of the U.S. More tellingly, each time that she came back, she spent less and less time in the U.S., to the extent that in 2003 she only spent two weeks in the U.S. before heading back to El Salvador. This is a case like some of the other cases I cite in my brief, where the alien is clearly living overseas and just returning to the U.S. to, like, touch base, ensure that she can come back and go back, and then go back to her country. So it's like Singh, where he spent just the summers in the U.S. It's like the board case of Kane and then some cases in other circuits, Moyne, Angelis, and Alim that I cite in my brief. The alien is, she's living overseas and then trying to come back just in time to sort of re-up her LPR status. The issue here, the precise legal issue, is whether her last trip abroad was a temporary visit, according to the statute. The court has defined that as to mean either a period that's relatively short or a visit that's designed to terminate upon a specific short-term event. For example, you go abroad to sell your house and you come back. If the event does not occur within that relatively short time, then the board looks at whether the alien had a continuous uninterrupted intent to return to the U.S. as soon as possible, within a relatively short time. In this case... So the standard, again, is an intent to return to the United States within a relatively short period of time. That's the standard. The first prong is, well, was it a relatively short visit? And that doesn't meet that criteria here. Then if it's not a short visit, we look at, well, what was the purpose and did they have this continuous uninterrupted intent to return in a relatively short time? The board said her visit didn't even meet that second criteria in that it wasn't geared towards an event that was planned to happen within a relatively short time. Her last visit, she left the U.S. saying she was leaving for a three- to five-month vacation. Now, that's not really a definite purpose, certainly not a definite time frame, and it didn't appear that she had a definite intent to return to the U.S. in a relatively short time, at the time that she left on that visit. She stayed in El Salvador then for five months before the occurrence of these events that she says prolonged her visit, and that's the death of her grandfather and then her depression and treatment for the depression. So during that five months, though, she had to have this uninterrupted intent to return to the U.S. in a relatively short time, but clearly she did not. For five months, she had no purpose, defined purpose there. There was no reason why she had to stay for such a long time. I think we need to focus on that five months and say, no, she did not have the necessary intent to return within a relatively short time during that five months. What does the record show as to the length of time that she was receiving treatment? She says that I think it started in October or November after her grandfather died and went until May, which was about a month before she left. But even if we accept that that sort of event, a death of a relative and depression, could prolong a genuine temporary visit abroad to the extent that the alien would stay within the terms of the statute, what I'm saying is before that even occurred, she'd already been in El Salvador for more than a temporary visit abroad because she was there without a clear intent to return to the U.S. in a relatively short period of time. It's my understanding that she also, even after the depression was evidently treated, she helped in her grandfather's business as well. Yes, if you look at her activities there, she helped in her grandfather's business. And this goes to the factors the court has relied on to get at this intent. Obviously, you have to look at all the facts to find out what the alien's intent was. And one of the factors is the person's business or employment activities. And here she did work in El Salvador. She was working in the family business helping her grandfather. That's similar to what she was doing in the U.S. when she was helping her aunt with babysitting duties. So that factor kind of is awash. I mean, she was working in both places. But in El Salvador, she had other duties, and that was to take care of her relatives, not just the children but the grandparents who were elderly. She did that on several visits. And those clearly were more pressing and immediate duties on her part for her then taking care of her aunt's children because that's where she spent most of her time. So her family ties and her family duties are on the side of El Salvador. That's where her loyalties and pressing duties lay. So that indicates that El Salvador was where she was making her home and not the U.S. Some of the other factors, like property, as Petitioner's Counsel points out, she didn't own property either place. That factor is not particularly dispositive here. So the two factors are her duties that apparently she was the one in the family that was delegated to take care of these elderly individuals and the business over there. And that was sort of her job. And so that's ways on the side of finding that she did abandon her residency to go to El Salvador. And then the other thing is just her trips and the nature of the trips, and that's the factor that the board mostly relied on. In addition to this five-month period in the last trip where she had no purpose really to be in El Salvador, when she returned, she had a return ticket for El Salvador for two months from her entry into the U.S. So that, again, is further evidence that she was just coming back to the U.S. to re-up her LPR status so she could go back to El Salvador for another prolonged period to do her family duties there, take care of the business, and so forth. Would such a person be eligible to come as a visitor? Yes, she could apply for a visa and come as a nonimmigrant visitor, sure. And there would be no impediment to a person doing that and being granted some type of temporary visitor status? As far as I know, now, the fact that she might say that she wanted to work here, that would tell against her she couldn't get a visitor visa. She was planning to work for pay here. And they might look at her pattern of trips with the concern that, well, is she likely to overstay? So there are factors they would look into, but certainly she could apply and her application for a visa would be considered. In fact, they were at the border. They were prepared to let her in on a temporary visitor's visa, but when she said that she was going to work for pay watching children, they said, well, you can't do that as a nonimmigrant, so we'll have to put you in proceedings. So she did have that option in this case to just come as a visitor. I'm surprised at your argument. It seems to me that you're putting one fact against another fact. Isn't the standard of view such that really the government only has to, at this point, suggest that there are facts which are substantial evidence to sustain what the BIA did, rather than even that they are more compelling than the facts of the petitioner? Isn't that your burden? Sure. Our burden at this point is just to show that the record doesn't compel the conclusion that she didn't abandon her residence. So it's a very, this court should look at the facts with a very deferential standard and just look at whether there is substantial evidence in the record to support the fact that the government met, or the conclusion that the government met its burden. And as to the burden, I just want to respond to something Petitioner's Counsel said about the word equivocal. I took that out of, the court has referred to the government's burden as showing clear unequivocal and convincing evidence of deportability, but the statutory standard now for the government to show deportability is just clear and convincing. So I believe that the correct standard now should be the one set forth in the standard, which is clear and convincing, and that's why I left the word unequivocal out, because of the statute. And that's cited in my brief. It's 8 U.S.C. 1229A. It's in that provision. So. I don't quite understand why you left that out. Because the clear unequivocal and convincing language comes from the old case of Woodby, which predates the new statutory language. So I believe that the new standard should follow the statute, which comes after the case, and just be clear and convincing. In any event, the court should review that under a deferential standard of whether there's substantial evidence, and under that standard, we believe the government did establish or the board's decision should be upheld and the petition for review denied. Thank you. You have some more time, counsel. I'd like to address that last issue first. And that's we are not dealing here with deportability. We're dealing with the burden to show that somebody has abandoned their LPR status, and that standard has not changed. It may have initially been based on the deportability standard, and maybe the deportability standard has changed, but the burden of proof on this issue has not changed. Counsel, I have just a question on that burden of proof. The law apparently on the board's duty, the law has changed. It's gone from the one standard to clear and unequivocal. It went to clear and convincing. On a different issue, though. On deportability. On deportability. Not on abandonment of LPR status. I see. I see. It's a different issue, and I think that's very significant. I see. That's not what's before the court. Well, but the board never did go to any different standard than the standard in front, did they? No. I mean, the board applied the standard they have, regardless of what the government's arguing to us. Yes. Yes, Your Honor. Also, Ms. Portillo was not working in El Salvador. She was not working in the family business. She testified repeatedly that her grandfather is illiterate and that she did, to use her word, as a favor, read things to him and helped him in things that were associated with the business, but she wasn't compensated. She's never worked, and she was compensated in the United States and did consider that her work. And I would ask that the court find that no reasonable fact finder could find that the government on these facts met its burden to cause this young lady to forfeit such a valuable right. Thank you very much. I appreciate your argument, both of you. And case 0771998, Portillo-Escobar v. Holder, is submitted. The case of 10-55037, Lee v. Corinthian College, has been submitted on the briefs.
judges: Brewster, Fletcher B. , Smith N. R.